UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| NICHOLAS A. USLER, JON EVANS, ANDREW ANDRADA, HANNAH VOSSEN, NOAH TANZ, KENNY KIERMAN, CHARLES SANKOWICH, BURCU KARACA, and KARA GOZDE, on behalf of themselves and a class of similarly situated individuals, | Civil Case No.: 1:21-cv-00447 _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| VITAL FARMS, INC., MATTHEW O'HAYER, RUSSELL DIEZ-CANSECO, and SCOTT MARCUS, | |
| Defendants. | |

Plaintiffs Nicholas Usler, Jon Evans, Andrew Andrada, Hannah Vossen, Noah Tanz, Kenny Kierman, Charles Sankowich, Burcu Karaca, and Kara Gozde, individually, and on behalf of a proposed Class and/or Subclasses (the "Class" or "Plaintiffs"), by and through their undersigned counsel, and as and for their class action complaint as against Defendants hereby allege as follows:

## I.  <u>SUMMARY OF CLAIMS</u>

1.     Vital Farms, Inc. ("Vital") sells very expensive eggs, and it sells a lot of them. Consumers pay these high prices for Vital's eggs—a commodity product—because Vital markets itself as an ethical company that treats animals in an ethical, humane, and transparent manner.  But Vital's marketing is false and misleading, and its consumers have been tricked into paying an unjustifiably high premium.

2.     Similar to companies who engage in greenwashing by making false claims about the environmental impact of their products, **Vital is engaged in humane-washing by making false claims about the humane nature of its products**.  While Vital provides hens access to

pasture, its business model and dictated agricultural practices are not ethical, humane, or transparent. Vital's extensive marketing claims, including those most material to consumer purchasing decisions, are false and/or half-truths designed to deceive customers into paying super-premium prices for its eggs. Vital acknowledges that it has "designed our brand and our products to appeal to customers' demand for ethically produced food," but it does so through falsehoods and misleading half-truths, which benefit Vital officers, insiders, and private equity sponsors at the expense of customers.

3.      On information and belief, Vital through its farmer network: (a) obtains hens from hatcheries that kill all male chicks at birth through shockingly cruel methods; (b) removes or permits the removal of the tips of hens' highly sensitive beaks; (c) confines hens in conditions that cause them to spend most of their time indoors, rather than on a "pasture"; (d) cultivates hens to lay far more eggs than they would naturally, leading to painful health issues such as bone density loss (osteoporosis); and (e) when hens stop laying shelf-stable eggs efficiently enough—once those hens have lived around 15-20% of their natural life spans—sells those adolescent hens to pet food companies, which kill them using unquestionably inhumane industrial slaughter methods.

4.      Vital is engaged in a simple, highly competitive, low margin business. It oversees farmers who run established chicken farming operations across the United States and who operate their egg businesses in accordance with Vital's purported humane and ethical business model. Vital, in its filings with the Securities & Exchange Commission ("SEC"), and in connection with its Facebook and other social medial advertising, and in each cartons of eggs it sells, describes itself as an *ethical food company*, which operates with "transparency and integrity" and which acts as "stewards of our animals." Vital, in its corporate disclosures, concedes that its massive marketing campaign where it describes itself as ethical, humane, and transparent is designed for

the purpose of selling its eggs at super-premium prices above the cost of traditional eggs and its competitors' "free range egg products":

> "We have designed our brand and products to appeal to consumer demand for ethically produced foods."

*   *   *

> "We believe consumers have grown to trust our brands because of our adherence to our values and a high level of transparency."

*   *   *

> "We educate consumers on our ethical values … to generate further demand."

Indeed, Vital defines its entire business model as "bringing ethically produced food to the table."

5.     Through pervasive advertising and in-box marketing, Vital has created a market niche for itself, whereby it charges super-premium prices for its eggs because it has convinced consumers and others in the marketplace that its products are produced humanely and ethically, and that its humane and ethical standards are practiced consistently and transparently in its entire business.  Vital's "ethical and humane" marketing campaign has enabled it to charge super-premium prices for its eggs, which are up to seven times the price of ordinary store-bought eggs.

6.     Moreover, as Vital concedes, most of its consumers, in reliance upon its marketing, have been convinced to purchase only Vital eggs in order to achieve humane and ethical goals. Vital conducted its own detailed study showing that at least "31% of our consumers insist on purchasing our egg brands and would not purchase another in its place."

7.      In sum, Vital is a public company—at times valued at nearly $1,500,000,000— that is built largely upon convincing consumers and others in the marketplace that it is a uniquely ethical business following humane and ethical practices with respect to farmed animals.  Its

representations in this regard not only relate to its purported treatment of farmed animals, but also to Vital's business model.

8.     Vital regularly describes its "ethical decision-making model" and its practice of producing ethically-produced foods.  Its representations in its ubiquitous marketing are not limited to its treatment of laying hens.  Instead, Vital's representations relate also to "farm animals" generally and to Vital's business model.  These representations distinguish Vital from some other free-range egg companies which purportedly treat hens "better," but do not claim to be humane companies or to treat all "farm animals" humanely.  Vital does not hold itself out as only treating "hens" humanely and ethically, but rather all of the animals Vital uses, such as male chickens, consistent with its ethical goals and humane business model.  In this regard, Vital states that it engages in "humane treatment of farm animals as a central tenet" and that it is a "steward for our animals."

9.     Indeed, in every box of Vital eggs, customers are directed to read the "Vital Times," an in-box newsletter prepared by Vital, which shows photographs of hens outdoors on green grass and states in relevant part that: "**Our farmers are invested in animal welfare and doing things the right way. And we're invested in them.  By bringing this carton home, you are too.**" Likewise, it is in these inserts, found in each and every box, that Vital tells customers that its "mission" and "central tenet" is "the humane treatment of farm animals."

10.     Vital's representations and its business model are based upon misrepresentations and half-truths in violation of the Deceptive Trade Practices statutes in Texas and other states and constitute fraud and fraud by omission in Texas as well.  Upon information and belief, far from being humane and ethical to farmed animals, and being stewards of such farmed animals, Vital is in fact engaged in unethical and inhumane practices directly and indirectly.

11.     Vital's marketing campaign and SEC registration statements prepared in connection with its initial public offering ("IPO") and secondary stock offering (which was recently effected) misrepresented that it is humane and ethical to all farmed animals and has a humane and ethical business model.  It concedes that customers believe in and rely upon these representations.  In fact, Vital's practices are not as advertised.  Upon information and belief:

a)     First, Vital's hens have their beaks "tipped," a euphemism for cutting or lasering off a portion of each hen's sensitive beak.  *See* Exhibit 1.

b)     Second, although Vital's hens may have "access" to grass or pasture, they are not, as advertised, "pasture raised" and do not enjoy an "outdoor lifestyle" as advertised. Instead, while hens have "access" to pastures through door slots, Vital's animal care practices ensure that many hens rarely—if ever—venture outdoors, and instead spend most of their time indoors in crowded stationary barns. *See* Exhibit 2, Exhibit 3.

c)     Third, these hens' life spans are diminished by as much as 85% by being forced to lay an egg a day from the age of 17 weeks old.  This artificially high rate of egg laying depletes the hens of calcium causing bone fractures, weakness and fragility, and the inability to continue laying eggs at the rate of an egg per day.  Then, rather than humanely and ethically caring for these "spent" hens, Vital engages in "end-of-life practices," including sending hens to "pet food plant[s] … pack[ed] … into crates and ship[ped] … in trucks hundreds of miles," after they have lived only 15-20% of their normal life span, which Vital's founder and executive chairman (O'Hayer) has acknowledged is both stressful and not humane. *See* Exhibit 4.

d)     Fourth, Vital supports, by purchasing hens from hatcheries, the process of chick culling—the killing of every male chicken who hatches.  The hatcheries from which Vital

purchases hens routinely engage in this practice, killing hatched male chicks with a meat grinder-like device (maceration), or by other similarly inhumane, unduly painful means. *See* Exhibit 5.

e)      Fifth, Vital states in its marketing that it is financing a "solution" to the culling of male chicks by investing in a company—Ovabrite, of which Defendant O'Hayer is also the CEO—that is seeking to develop a technology to determine egg sex before the chicken is hatched.  Yet Vital or its affiliate Ovabrite has in fact sued the company that promised to develop this technology, both for fraud—because that company, allegedly, never even possessed the capability to develop this technology—and for failing to even complete the "Alpha Phase" of development. *See* Exhibit 6. Consumers would be misled into thinking that Vital is better than competing egg-sellers on this issue.  Rather than acknowledging that it is part of the maceration problem, Vital continues to imply, misleadingly, that it is at the forefront of attempts to end this inhumane slaughter.

12.     In sum, Vital is engaged in a ubiquitous pattern of deliberate and gross misstatement of its business model and practices in order to make outsized profits and to materially benefit its insiders and private equity sponsors.

13.     Vital has sold millions of eggs based upon its representations that its business is humane and ethical, when in fact it engages in or allows in its chain of commerce practices that are inhumane, unethical, outrageous, and unconscionable.  Moreover, as the marketplace becomes aware of this practice, its business model is likely to collapse.  As Vital itself has stated, customers believe Vital's marketing materials that profess Vital ethically produces food. Vital's own internal study shows that almost one-third of its customers will not purchase **any other eggs because of their desire to further the humane and ethical practices in which Vital purports to engage.**

14.     Vital's misrepresentations, omissions, and half-truths are actionable under Deceptive Trade Practices statutes for each State and constitute fraud and fraud by omission in the State of Texas.  This action seeks to remedy the material and substantial misrepresentations and half-truths promulgated by Vital, on behalf of consumers of various States who have purchased Vital eggs at super-premium prices for the purpose of furthering their legitimate interest in the humane and ethical treatment of farmed animals.  These purchasers, all of them, have been duped. They have paid super-premium prices for eggs which are produced through a process that is objectively inhumane, unethical, outrageous, and unconscionable, while being tricked by Vital into believing that it was humane and ethical.

## II.     THE PARTIES

### A.     Plaintiffs

15.     Nicholas A. Usler is a resident of the State of Michigan.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Mr. Usler would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices. Mr. Usler reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated his decision to purchase Vital eggs both initially and on an ongoing basis. Mr. Usler would only consider purchasing Vital eggs in the future if Vital were to

treat farmed animals in a manner consistent with Vital's advertising, or if the eggs were sold without super-premium prices.

16.     Jon Evans is a resident of the State of California.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Mr. Evans would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices.  Mr. Evans reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated his decision to purchase Vital eggs on an ongoing basis. Mr. Evans would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising.

17.     Kenny Kierman is a resident of the State of California.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Mr. Kierman would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices. Mr. Kierman reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors

on green grass, which motivated his decision to purchase Vital eggs on an ongoing basis. Mr. Kierman would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising, or if the eggs were sold without super-premium prices.

18.     Andrew Andrada is a resident of the State of Texas.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Mr. Andrada would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices. Mr. Andrada reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated his decision to purchase Vital eggs on an ongoing basis. Mr. Andrada would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising, or if the eggs were sold without super-premium prices.

19.     Hannah Vossen is a resident of the State of Florida.  She purchased Vital eggs on a regular basis because she believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, she was furthering her own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Ms. Vossen would not have paid a super-premium price for

Vital eggs had she known the truth about Vital's practices. Ms. Vossen reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including social media marketing and box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated her decision to purchase Vital eggs both initially and on an ongoing basis.

20.     Noah Tanz is a resident of the State of New York.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Mr. Tanz would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices. Mr. Tanz reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including social media marketing and box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated his decision to purchase Vital eggs both initially and on an ongoing basis. Mr. Tanz would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising, or if the eggs were sold without super-premium prices.

21.     Charles Sankowich is a resident of the State of New York.  He purchased Vital eggs on a regular basis because he believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, he was furthering his own humane and ethical interests with respect to the humane

and ethical treatment of farmed animals.  Mr. Sankowich would not have paid a super-premium price for Vital eggs had he known the truth about Vital's practices. Mr. Sankowich reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated his decision to purchase Vital eggs on an ongoing basis. Mr. Sankowich would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising.

22.     Burcu Karaca is a resident of the State of New York.  She purchased Vital eggs on a regular basis because she believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium price, she was furthering her own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Ms. Karaca would not have paid a super-premium price for Vital eggs had she known the truth about Vital's practices. Ms. Karaca reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated her decision to purchase Vital eggs on an ongoing basis. Ms. Karaca would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising.

23.     Kara Gozde is a resident of the State of New York.  She purchased Vital eggs on a regular basis because she believed that Vital employed unique humane and ethical farming practices with respect to all of the farmed animals in its supply chain, including providing them freedom from undue pain and distress, and that by purchasing such eggs, even at a super-premium

price, she was furthering her own humane and ethical interests with respect to the humane and ethical treatment of farmed animals.  Ms. Godze would not have paid a super-premium price for Vital eggs had she known the truth about Vital's practices. Ms. Godze reasonably relied upon misrepresentations and omissions discussed herein in purchasing Vital eggs, including the box inserts promising "humane treatment of farm animals" and showing photographs of hens outdoors on green grass, which motivated her decision to purchase Vital eggs on an ongoing basis. Ms. Godze would only consider purchasing Vital eggs in the future if Vital were to treat farmed animals in a manner consistent with Vital's advertising.

**B.    Defendants**

24.    Vital Farms, Inc. is a Delaware public benefit corporation, headquartered and having its principal place of business in or around Austin, Texas, which issued shares publicly pursuant to a Registration Statement filed under the Securities Act of 1933.  Contemporaneous with Vital's receipt of a previous draft of this Complaint, Vital issued additional shares and/or permitted the sale of registered shares based upon its existing Registration Statement (the "Secondary Offering").  The misrepresentations contained and described herein were included in the description of Vital and its business model in its Registration Statement, its Secondary Offering Registration Statement, its public advertising, and in each box of Vital eggs.

25.    Matthew O'Hayer is on information and belief a resident of the State of Texas and is the Founder and Executive Chairman of Vital.  At the time of Vital's IPO, O'Hayer had an equity interest in Vital worth approximately $500 million.  On information and belief, O'Hayer exercises a high degree of control and/or influence over the advertising, marketing, and business operations of Vital—and, given its small management team, effectively exercises day-to-day control over the business and its marketing.

26.     Russell Diez-Canseco is on information and belief a resident of the State of Texas and is the President, Chief Executive Officer, and a Director of Vital.  On information and belief, Mr. Diez-Conseco conceived, controlled, and had supervision over Vital's marketing and advertising.  Diez-Canseco, as of the effective date of the Vital's IPO, owned an equity interest in Vital worth more than $100 million.

27.     Scott Marcus is on information and belief a resident of the State of Texas and is the Chief Marketing Officer of Vital.  As Chief Marketing Officer, Marcus was responsible for the false and misleading marketing materials described herein.

### III.     JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453, because the number of proposed Class members exceeds 100, the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, and some Plaintiffs and the other Class members are citizens of a different State from Defendants.

29.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because Vital maintains its principal place of business in this District and substantial parts of the events or omissions giving rise to the claims at issue described herein occurred in this District.

30.     This Court has personal jurisdiction over each Defendant because each Defendant directly, with their respective directors, officers, employees, representatives, and/or agents participated in the acts, practices or omissions giving rise to the claims described herein in this District.

### IV.   FACTS COMMON TO ALL CLAIMS FOR RELIEF
#### (Vital's Deceptive Acts and Practices with Respect to its Purported Humane and Ethical Practices)

31.     The production and sale of eggs is a commodity business.  It involves extremely low margins, substantial competition, and low barriers to entry.  Consequently, the egg production business is, in general, not a highly profitable business.  Nevertheless, Defendants, and the private equity firms who invested in and promoted Vital's IPO, schemed to create a business model which could, through material misrepresentations and omissions, sell eggs at super-premium prices and margins up to seven times those achieved through the sale of ordinary, commercial eggs.

32.     Defendants are aware of and designed a scheme to take advantage of a growing population of American consumers who believe that it is important that the food industry treat all farmed animals, including chickens, humanely and ethically.  These consumers are willing to spend more than they would for commodity foods if it means that the food comes from animals who are treated humanely and from processes that are humane and ethical.  Defendants, well aware of this consumer trend, took advantage of it through material misrepresentations and omissions and an unconscionable business model.  This business model not only involved making the misrepresentations and material omissions described herein, but also monetizing these misrepresentations through a misleading IPO and secondary issuance of Vital securities, whereby Vital insiders and private equity sponsors became fabulously wealthy.

33.     Indeed, only several months ago, Defendants—riding a wave of retail support based upon Defendants' misrepresentations with respect to their purported humane, ethical, and transparent business model—were able to achieve something which seemed impossible.  They were able to take public an egg business, which at the time only had approximately *$140 million in revenue*, and was barely profitable, at a market capitalization of almost $1.5 billion—more than 10 times its revenue.

34.     Given the traditional low margin nature of the egg business and the limited growth opportunities available in the already-saturated egg market, Defendants' IPO proposition seemed farcical.  Defendants realized, however, that a small segment of the American population who highly values humane and ethical treatment of animals would pay super-premium prices for their eggs, and that a busines model pitched to investors, based upon this segment of the market, and the super-premium prices that these consumers might pay, could succeed.  And, in fact, it did. Defendants were able to monetize the misrepresentations through an IPO in September of 2020, thereby making several of Vital's officers and equity sponsors immensely rich.

35.     Shortly after the IPO, Vital's founder, Defendant O'Hayer (an egg farmer) held Vital shares worth almost half a billion dollars, a staggering amount achieved through the misleading business model upon which Vital went public.  Other officers of Vital, shortly after its IPO, likewise held many millions of dollars in Vital shares.

36.     Thus, Defendants' scheme was not simply designed to generate increased sales through unconscionable misrepresentations to ethical consumers, but also to make an almost unbelievable fortune from a business that is traditionally barely profitable.

37.     Defendants' material misrepresentations, omissions, and unconscionable business practices include ubiquitous advertising and marketing.

38.     Vital is a voracious advertiser of its egg products, using print, internet, social media, and other forms of advertising.  This advertising was essential to the scheme Defendants engaged in because Defendants needed to establish themselves as uniquely humane and ethical.  Indeed, they had to appear more humane and ethical than any of their competitors in order to achieve super-premium pricing for their basic commodity—eggs.  Indeed, Vital has sued at least one of its competitors in the "pasture raised" egg business alleging that from time to time this egg producer

did not use pasture raised eggs.  Ironically, while suing its competitor, Vital was itself relying upon false marketing and a misleading business model.

39.     Among Vital's uniform, widely disseminated misrepresentations with respect to Defendants' practices and business models are the following:

a)  Photographs of hens outdoors in green grass;

b)  "Vital Farms is an ethical food company";

c)  "Our ethics are exemplified by our focus on the humane treatment of farm animals";

d)  "Vital Farms makes ethical snacking easy";

e)  "Looking for ethically produced food? You've found it.";

f)  Vital is "committed to ethical decision-making";

g)  Vital has an "ethical mission";

h)  Vital has a "mission to bring ethically produced food to the table";

i)  The "central tenet" of Vital's "mission" is "the humane treatment of farm animals";

j)  "[Vital's] farmers are invested in animal welfare and doing things the right way";

k)  Vital acts as "stewards of our animals"; and

l)  "Our ethics are exemplified by our focus on the humane treatment of farm animals."

40.     Many of the same misrepresentations appeared in Vital's S-1 Registration Statement that was publicly filed with the SEC, to register Vital securities that were sold to the

investing public through some of the nation's largest brokerage firms in connection with Vital's IPO.

41.     To support its false image as an ethical and humane food company, Vital went so far as to incorporate itself under Delaware law as a "public benefit corporation", which requires Vital to "balance the financial interests of [its] stockholders with the best interests of those stakeholders materially affected by our conduct, including particularly those affected by the specific benefit purposes set forth in our certificate of incorporation." Those "specific benefit purposes" include "bringing ethically produced food to the table" and "being stewards of our animals." In other words, Vital represented that it would balance the financial interests of its shareholders against the interests of its consumer stakeholders in purchasing food that was "ethically produced" from a company that acts as a steward of its animals.  Given that Vital's food is not ethically produced, and that it does not act as a steward of its animals, it is clear that it tipped the scales heavily in favor of its shareholders—including the individual Defendants—and against its consumers. Vital's touting of its status as a public benefit corporation enhanced its image as a humane and ethical company in an improper and false light.

42.     Vital's ubiquitous advertising made clear that its principle financial goal was tapping into the market of American consumers who believe in and would pay super-premium prices for food that is the result of humanely and ethically treated farmed animals, including all chickens.  Among the marketing statements made by Vital in this regard are the following:

   a)   "We have designed our brand and our products to appeal" to a "consumer movement" for "ethically produced" foods;

   b)   Vital employs an "ethical decision-making model";

c)   "Consumers have grown to trust our brand because of our adherence to our values and a high level of transparency.";

d)   "We're on a mission to bring ethically produced food to the table";

e)   The "central tenet" of Vital's "mission" is "the humane treatment of farm animals";

f)    "[Vital's] farmers are invested in animal welfare and doing things the right way";

g)   Vital is "committed to ethical decision-making.";

h)   Consumers "relate to our values and trust our practices.";

i)    "We believe consumers have grown to trust our brands because of our adherence to our values and a high level of transparency."; and

j)    Vital uses "digitally integrated media campaigns, social media tools and other owned media channels" to "educate consumers on our ethical values" in order to "generate further demand for our products and ultimately expand our consumer base."

Each of the above-quoted statements were included in Defendants' extensive marketing campaigns, or in their public filings.  Each involved material misrepresentations of fact and/or material omissions of fact necessary to make the statements true.  This was all by design.  Vital's goal was to falsely convince American consumers that its product was worth super-premium prices.

43.      The truth about Vital's unconscionable, inhumane, and horrific chicken practices is anything but humane, ethical, and transparent.  Far from being stewards of farmed animals, and on an "ethical mission," Vital is engaged in hidden, unethical, and inhumane agricultural

practices—that, because of the unequal balance of sophistication and knowledge between Defendants and Plaintiffs, as well as other reasonable consumers, are beyond the latter's ability to sufficiently investigate. On information and belief:

a)   Defendants sell hens to be killed in an inhumane fashion as soon as they stop their artificially high egg laying rate—usually at around one and a half years old. *See* Ex. 4. Chickens can live for more than a decade.  Hens kept by Defendants lay on average an egg per day (every day), for a far shorter period of 13 to 24 months.  This excessive rate of egg laying depletes the hens of calcium and substantially decreases their egg production, while also causing undue pain via conditions stemming from hypocalcemia such as osteoporosis, bone fractures, weakness, paralysis, and sudden death.  Rather than committing to treating these adolescent hens humanely by feeding and caring for them for their natural lives—or even taking the minimal effort to euthanize hens using less painful or error-prone methods on-farm, using an on-farm euthanasia facility or mobile euthanasia unit—Defendants instead sell them to be killed.  Before their horrific journey to the slaughterhouse, many "spent" chickens are caught by workers and placed in crates which often results in bone breakage.  After enduring shipment to the slaughterhouse, the hens are often dumped from the crates. Those who are properly sorted are hung upside down in shackles. Thereafter, their throats are cut open and they are dumped in boiling water for feather removal. Defendant O'Hayer himself has described this process in an interview as inhumane:

> "*If you send them to a pet food plant, which is the biggest use of spent hens, they pack them into crates and ship them in trucks hundreds of miles.  Its stressful for them and not very humane.*" Ex. 4.

There are many other gruesome ways that killing of "spent" chickens typically takes place, including suffocation by use of carbon dioxide.  Defendants' sanctioning of and commercial participation in these inhumane, unethical, and not clearly disclosed practices demonstrates the

falsity of their claims to be ethical and humane, and of the picture they paint for consumers of happy long lived hens eating grass.

b)      Defendants also condone farmer beak cutting.  Hens on Vital's network of farms have had their beaks "trimmed," which is an industry euphemism for reducing the sharp points of a hen's beak, often using blades or infra-red light.  *See* Ex. 1.

i)      Chicken beaks are particularly complex and sensitive sensory organs.  The tips of the chicken beaks contain highly sensitive mechanical receptors, which are capable of feeling pain, and are used to engage in precise tactile behaviors.

ii)     Beak cutting, even by infra-red light, can reduce sensory functions and disturbs instinctive foregoing behaviors.  Other maladies associated with beak cutting, including routine, painful discomfort performing natural behaviors, are well documented.

iii)    Beak cutting is an undue, rather than necessary, cause of pain—it can be avoided via humane flock management practices that prevent extreme density and stress—but is consistent with improving Vital's profit margin of Vital by preventing pecking and potential cannibalism by hens in crowded social groupings and in stationary barns.  Beak cutting is neither humane nor ethical.

c)      Vital and its farmer network financially support the killing of male newborn chickens who are massacred through one of several means at birth or very soon thereafter.  Below are pictures depicting one industry-standard method by which this massacre ordinarily takes place, which is known as maceration.





   i)  Maceration involves dumping large numbers of recently hatched male chickens who are fully alive and capable of reaching full lives into a device resembling a commercial meat grinder, turning them into pulp.  Video of this process is available at the following link: https://youtu.be/xPbeh67VVnk.

   ii)  The process is so objectionable—and unnecessary to humane husbandry of farmed animals—that several European countries have outlawed it and others are in the process of outlawing it and/or limiting its use.  Nevertheless, hatcheries used by Vital actively destroy newborn male chickens.  By purchasing hens from these hatcheries, Vital financially supports and helps to perpetuate this horrific practice—despite the misleading contentions of Vital and Defendant O'Hayer that they "maintain a close connection" to a "team of scientists"

developing technology that will allow farmers to determine the sex of chickens while still in the egg and thus not to hatch male chickens.  This is misleading.  In fact, Vital has sued the developer of this technology alleging that it lied about the efficacy of the technology and in fact defrauded Vital. *See* Ex. 6.

44.     Despite Vital's attempt to cloak itself with Environmental, Social, and Governance ("ESG") credentials for solving the mass killing of male chicks, the truth is it has little to do with a potential solution.

## A.     MISREPRESENTATION AS TO "PASTURE RAISED"

45.     Defendants' primary marketing claim is that their hens are "pasture raised."

"Sunshine? Check. Pastures? Check. Dust bathing with friends?  Check, check, check. Our girls wake up ready to explore and then, after a full day, sleepy and content, they rest up to do it all over again.  We watch them dash into the day with renewed excitement about simple things – a crunchy snack, a wildflower, and it gets us thinking."

*     *     *

"[T]ake a lead from the girls … Go outside. Every day."

This claim is reinforced by photographs included with cartons of Vital eggs showing hens outdoors in lush vegetation, as well as Vital's social media marketing. *See, e.g.,* Exhibits 7 and 8.  The truth is far bleaker than the pastoral image depicted to establish Vital's ESG credentials with consumers.

46.     In fact, on information and belief, the truth is far different. *See, e.g.,* Exs. 1 and 2.

b)     First, Vital, on information and belief, stocks hens indoors at extreme densities not significantly greater than the shockingly inhumane minimum indoor space allowances—ranging from 1.2 to 1.5 square feet of space depending on the layout of individual operations—permitted by Vital's third-party certifier. *See* Ex. 3. These hens will be unable to access outdoor space without pushing past other hens, who are likely stressed and frantic from dense confinement that prevents them from engaging in natural behaviors that are key to

preventing undue physical and psychological pain, spurs distressing excessive vocalization, painful self-mutilation, and physical harm to themselves and other hens. Many hens will not succeed in, or even attempt, this unduly painful journey, and so will never or ineffectively access outdoor pastures.

c)      Second, Vital hens are generally raised in large stationary barns with door openings to give "access" to the outdoors.  Vital does not permit operations it partners with to use mobile coops.  *See* Ex. 1.  Because of Vital's "confinement style" operations, many hens will never venture outdoors.  *See id.*  Vital's depictions and marketing terms convey the false image that all hens are outdoors all day or most of the day.

d)      Third, on information and belief, weather conditions during the winter months in the so-called pasture belt where Vital's farmers operate make it difficult, if not impossible, to allow free ranging.

47.     Defendants' practice of describing Vital's business model and practices as humane and ethical with respect to farmed animals takes advantage of consumers' lack of knowledge, ability, experience, and capacity to a grossly unfair degree, as it is beyond the ability of Plaintiffs, as well as other reasonable consumers, to sufficiently investigate Defendants' business model and practices given the unequal balance of sophistication and knowledge between the parties.

48.     Defendants' practice is also completely distinct from the marketing and advertising used by other companies.  Many of these companies, rather than describing themselves as ethical and humane stewards of farmed animals, merely describe the fact that they treat their hens somewhat differently than large commercial farmers, who keep them caged at all times.  As such, these companies' eggs do not sell at the super-premium prices charged for Vital eggs.  Vital engaged in its lies and misrepresentations to distinguish itself from direct competition so that it

would be able to charge the highest premium prices for its eggs to unsuspecting buyers who value humane and ethical treatment of farmed animals.

49.     The foregoing conduct constitutes an unconscionable, intentional, knowing, and deliberate violation of Deceptive Trade Practices and warranty statutes of each of the States outlined below.

## B.     DEFENDANTS' DISCLOSURE CHANGES ADMIT THEIR CULPABILITY

50.     Pursuant to Texas' Deceptive Trade Practices law, Plaintiffs were required to send Defendants a demand letter prior to filing suit.

51.     In late 2020, Plaintiffs sent Defendants' counsel, Cooley LLP, a demand including a draft of Plaintiffs' complaint.

52.     Immediately thereafter and without notice to Plaintiffs' counsel, Vital surreptitiously changed its disclosures on its website, including a revised FAQ page buried on Vital's website (https://vitalfarms.com/faqs/).  Only *after* Plaintiffs sent their demand and draft complaint to Vital did Vital bury the following on its website:

### "WHAT HAPPENS TO MALE CHICKS?

"Because male chicks will not grow to become egg laying hens, it is the industry norm for hatcheries to cull them shortly after they hatch through means deemed acceptable by the American Veterinary Medical Association. Despite industry research and testing led by universities and scientists to explore alternatives to this practice, to our knowledge, all hatcheries in the U.S. cull male chicks because a commercially viable alternative has yet to be identified."

53.     The hyperlink disclosure made only *after* Vital's receipt of Plaintiffs' draft complaint shows Vital's culpability and its failed attempt to remedy the market impact of its continuing and pervasive marketing falsehoods and half-truths.

54.     The same revised website FAQ contains Vital's new disclosures regarding "What Happens When a Hen has Reached its Post Laying Life?" including:

> "[W]hen retirement time comes for these laying hens, our small family farmer partners have little choice but to 'retire' their flock en masse either through an acceptable method of euthanasia or by selling them to pet food companies, which we believe helps make use of this precious resource."

Vital has not otherwise changed its marketing falsehoods. Plaintiffs themselves have not viewed this buried disclosure.  Nor would any consumer have any reason to do so, because Vital does not sell products direct-to-consumer on its website and this purported disclaimer is difficult to find on Vital's website.

56.    Burying these disclosures in a hyperlink on Vital's website does not cure its ongoing misrepresentations.  And it certainly does not remedy its previous misrepresentations and omissions, which led to the sale of millions and millions of high-priced eggs purchased by the Class, including Plaintiffs. It does, however, demonstrate that Vital knew its prior disclosures were false and misleading.

## V.    CLASS ACTION ALLEGATIONS

### A.    Class Definition

56.    Plaintiffs seek to represent one nationwide class and five subclasses in this case. Each of the subclasses consists of purchasers of Vital eggs in a specific state.  These States are California, Florida, Michigan, New York, and Texas (each a "State Class," e.g., the "California State Class," "Florida State Class," etc., and collectively the "States Classes").  Plaintiffs also seek to represent a nationwide fraud by omission class (the "Nationwide Class," and together with the States Classes collectively referred to herein as the "Classes").

57.    Excluded from each of the Classes are the Defendants and any entities in which the Defendants have a controlling interest and their respective officers, directors, legal representatives, employees, successors, subsidiaries, assigns, immediate family members, and heirs of such persons and entities.  Also excluded from any such Class are corporate entities or similar entities

who are defined as non-protected parties under each respective State's Deceptive Trade Practices statute at issue.

**B.      Numerosity:  Federal Rule of Civil Procedure 23(a)(1)**

58.      The members of the Classes defined herein are so numerous and geographically dispersed that the individual joinder of all Class members is impracticable.

59.      The States Classes defined herein include thousands of members per State.

60.      Members of the Classes may be notified of the pendency of this class action by judicially accepted and Court approved notice directly or via publication.

**C.      Commonality and Predominance:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

61.      This action involves common question of law and fact that predominate over any questions of fact for any individual members of the Classes.

62.      Plaintiffs' claims do not seek damages for personal injury of any nature.

63.      The Classes only seek damages resulting from the overt misrepresentations and fraudulent deceptive practices related to the sale and marketing of the Vital eggs described herein, and permanent injunctive relief.  Defendants themselves have conceded from their own internal study that a large percentage of their customers only purchase Vital eggs as a result of their belief that these products were (based upon uniform misrepresentations and omissions made by Defendants) a result of humane and ethical practices, when they are not.  Defendants' revenue and profits are, based upon its own statements, wholly dependent upon such purported ethical and humane practices and business model.  Therefore, there is commonality with respect to the injuries suffered by each member of the Classes.

64.      Common questions of law and fact predominate over questions affecting individual members of the Classes, including without limitation:

a)       Whether Vital knew or should have known that its misrepresentations and material omissions were false;

b)       Whether Vital was violating the respective state laws outlined herein in connection with its material misrepresentations and omissions with respect to the qualities of Vital eggs and the process by which they were derived; and

c)       Whether Vital made deliberate and unconscionable misrepresentations with respect to the qualities and process by which Vital eggs are produced.

**D.    Adequacy of Representation:  Federal Rule of Civil Procedure 23(a)(4)**

65.    Plaintiffs are adequate representatives of the Classes because their interests align with and do not conflict with the interests of other members of the Classes whom they seek to represent.

66.    Plaintiffs have retained competent, experienced counsel, who have many years of experience in complex class action litigation, including consumer litigation, to represent them, and Plaintiffs' intent is this counsel will vigorously prosecute this action.

67.    The Classes' interests are fairly and adequately represented by Plaintiffs and the counsel they have selected.

**E.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

68.    The prosecution of separate actions by each individual member of the various State Classes and the Nationwide Class would create a risk of inconsistent or varying adjudications with respect to each member of the Classes that would establish incompatible standards of conduct for Defendants.

69.    Such individual actions would create a risk that adjudication would be dispositive of the interests of the members of all Classes and might impair their interests.

70.     Defendants have acted or refused to act on grounds generally applicable to the Classes, making final injunctive relief and declaratory relief appropriate.

**F.      Superiority:  Federal Rules of Civil Procedure 23(b)(3)**

71.     A class action is superior to any other available means for a fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this case.

72.     The damages and other financial detriments suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their individual claims against the Defendants, so it would be impossible for such members to individually seek redress for Defendants' unlawful and unconscionable conduct.

73.     Even if members of the Classes could afford litigation, individualized litigation would create a potential for inconsistent and contradictory judgments that would dramatically increase the delay and expense to all parties and the judicial system.

74.     By contrast, the class action device presents few management difficulties and provides the benefit to all parties of a single adjudication the use of comprehensive supervision by a single court and the benefit of a single final judgment.

## VI.      <u>CAUSES OF ACTION</u>

**COUNT I:**
**Breach of Express Warranty Under Texas Law**
**and the Law of the State of Residence of Each Class Representative Respectively**
**(On Behalf of Each State Class)**

75.     Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

76.     By directly warranting that purchasers of Vital eggs purchase and receive eggs which are produced in a humane, ethical, and transparent fashion, Defendants expressly warrant to the Plaintiffs and Class members such facts.  Indeed, such facts were specifically warranted in writing to each purchaser of Vital eggs in a document denominated by Vital as "Vital Times," a copy of which is included in each dozen egg box consumers purchased.  This direct communication included as part of each sale contains the same warranties described herein, including without limitation, that: (1) Vital and its farmers "believe in ethical food"; (2) Vital and its farmers are "invested in animal welfare"; (3) Vital and its farmers are "doing the right thing"; (4) Vital's "mission" and "central tenet" is "the humane treatment of farm animals"; and (5) hens on Vital farms can, as depicted in photographs, roam freely outdoors.

77.     As described herein, Vital has misrepresented its status as an ethical and humane steward of animals.  As such, it has intentionally, knowingly, and for the purpose of obtaining above market profits unconscionably breached such warranties.

78.     Such warranties were also made by Vital in a nationally uniform advertising campaign, including internet, social media, and print advertising.

79.     By advertising these claims, Defendants engaged in making express warranties to purchasers of Vital eggs.  These were factual representations. Vital's own marketing study demonstrate a reasonable consumer would consider them material in their purchase of Vital eggs, and all named Plaintiffs did in fact rely on them as material factors underlying their regular purchases of Vital eggs.

80.     The warranties described herein were not complied with by Vital and the Defendants, and as such, Vital and the Defendants are in breach of such express warranties.

81.     As a result of such foregoing breaches of express warranties, Plaintiffs and the class members have been damaged.  Furthermore, they purchased Vital eggs that were sold in breach of such warranties at excess prices, so that the eggs were less valuable than what was paid for them. This is demonstrated by the fact that eggs which are not sold with such warranties sell at a substantially lower price than Vital eggs.

**COUNT II:**
**Common Law Fraud/Fraud By Omission Under Texas law**
**(On Behalf of the Nationwide Class)**

82.     Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

83.     Defendants intentionally and knowingly omitted to state material information necessary for customers to properly evaluate the statements made with respect to the qualities and characteristics of Vital eggs.  Defendants have conceded this point by surreptitiously and materially changing their website hyperlinked disclosures to admit to certain inhumane and unethical practices after receiving a draft of this Complaint.

84.     Plaintiffs and the Nationwide Class are presumed to have relied upon the material misrepresentations and omissions outlined above.  All named Plaintiffs did in fact rely on them as material factors underlying their regular purchases of Vital eggs.

85.     Defendants have conceded that Plaintiffs and the Nationwide Class relied upon their material misrepresentations and omissions because they have conducted an extensive study, which they have publicly disclosed, showing that at least 31% of their consumers are so convinced by their advertising with respect to ethical and humane treatment of all animals, that they would not purchase any egg product other than Vital eggs.  That Defendants themselves have conducted such a study is a concession that their misrepresentations are both material and effective and are incorporated in the purchasing decisions of Plaintiffs and the Nationwide Class.

86.     Plaintiffs and the Nationwide Class did not know and had no reason to know that the purported humane and ethical nature of the eggs sold by Vital was misrepresented and that Defendants failed to make material disclosures with respect thereto.  Defendants' own studies demonstrate the effectiveness of their pervasive misrepresentations and material omissions.

87.     Defendants intended that Plaintiffs and the Nationwide Class would rely upon the misrepresentations and omissions described herein.

88.     Plaintiffs and the Class members have been injured as a result of Defendants' fraudulent conduct.

89.     Defendants are liable to Plaintiffs and Class members for damages sustained as a result of Defendants' fraud.

**COUNT III:**
**Texas Deceptive Trade Practices Consumer Protection Act**
**(On Behalf of Plaintiff Andrada and the Texas State Class)**

90.     Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

91.     In this Count, Plaintiffs pursue a claim on behalf of all Class members pursuant to the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA"), Texas Business & Commerce Code §§ 17.41, *et seq*.

92.     The TDTPA provides relief for consumers and provides that a consumer may maintain an action for monetary damages, punitive damages, and legal fees, wherein any of a series of delineated types of misconduct are engaged in by Defendant and produce actual damages.  These prohibited types of conduct are set forth in Section 17.50 of the TDTPA and include without limitation conduct engaged in by Defendants:

a)      Specifically, the TDTPA prohibits and provides a private right of action as against Defendants who employ a misleading or deceptive act or practice, *or* who engage in any

unconscionable action *or* course of action, or who engage in any breach of express or implied warranty.

       b)     Plaintiffs and the Class members allege multiple violations of the TDTPA:

           i)     First, Defendants' persistent use of unconscionable and grossly unfair acts and practices in connection with their continued misrepresentations and material omissions with respect to the marketing of Vital eggs; and

          ii)     Second, as described above, a breach of express warranties made by Vital to customers through advertising, marketing, and through direct written communication in connection with each sale.

93.    As described in the TDTPA, a false, misleading or deceptive act or practice includes: (a) "representing that goods or services have … characteristics … or qualities which they do not have … and representing that goods or services are for a particular standard, quality, or grade, or that goods are for a particular style or model…." Defendants' conduct specifically violates both of these provisions describing false, misleading, or deceptive acts or practices as well as being unconscionable and in violation of the TDTPA, and a breach of express warranty in violation of the TDTPA.

94.    The above-described deceptive acts and practices are unconscionable and a breach of express warranty by Defendants. Because of the unequal balance of sophistication and knowledge between Defendants and Plaintiffs, as well as other reasonable consumers, these acts and practices are beyond the latter's ability to sufficiently investigate. These acts and practices caused substantial injury to Plaintiffs and Class members and continue to do so. Plaintiffs and Class members had no reasonable means to avoid such injury. The substantial injury incurred by

Plaintiffs and the Class members is not outweighed by any other public interest.  Defendants' only apparent objective in connection with their misrepresentations and material omissions was profit.

95.     Defendants knew that their business practices are unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts, practices, unconscionable conduct, and beaches of warranty are knowing, willful, wanton, and reckless.

96.     As a direct result of Defendants' acts and practices, Plaintiffs and Class members have suffered an ascertainable loss of money or property as described herein, including, but not limited to, for the Class, the loss of money paid for Vital eggs sold at super-premium prices.

97.     Plaintiffs and Class members seek declaratory relief, injunctive relief, treble damages, and attorneys' fees under the TDTPA.

98.     Plaintiffs and the Class members are in compliance with Article 17.50 of the TDTPA and have provided written notice of Plaintiffs' specific complaints as described herein and the amount of their actual damages and expenses to Defendants more than sixty (60) days prior to the filing of this lawsuit.

**COUNT IV:**
**California Unfair Competition Law**
**(On Behalf of Plaintiffs Evans and Kierman**
**and the California State Class)**

99.     Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

100.     Defendants, operating directly or indirectly in California, with the intent of selling personal property or performing services, made untrue or misleading statements about such property and/or services which they knew, or with the exercise of reasonable care should have known were untrue and misleading in violation of California Business and Professions Code § 17500 and the California Consumers Legal Remedies Act.  Similarly, Defendants made false or

misleading advertising and marketing claims as described herein in violation of California Business and Professions Code §17508. Further, Defendants misrepresented the character and nature of their business in violation California Business and Professions Code §17505.

101. As a direct and proximate result of these practices, Plaintiffs and the California State Class seek to represent individuals who suffered injuries to legally protected interests, as described herein, including, but not limited to the loss of monies paid for the purchase of Vital products sold at super-premium prices.

102. The above-described unfair and deceptive practices and acts by Vital were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and the California State Class they seek to represent. These injuries could not have been avoided by the Plaintiffs. Defendants' misrepresentations and material omissions are within the common law or statutory or other established concepts of unfairness and unconscionability.

103. Defendants knew or should have known that their practices were unfair and deceptive. Defendants' actions engaging in the above-named unfair practices and deceptive acts were knowing and willful and/or wanton and reckless with respect to the rights of the California State Class members.

104. Plaintiffs and the California State Class they seek to represent seek monetary damages and injunctive relief and join together to stop Defendants from continuing their unfair and deceptive acts. The amount of such damages will be determined at trial on behalf of the California State Class.

105. The California State Class also seeks reasonable attorneys' fees and costs and other just and proper relief as is available under California Business and Professions Code §17500, *et. seq.* and California Code of Civil Procedure § 1021.5.

**COUNT V:**
**Florida Unfair and Deceptive Trade Practices**
**(On Behalf of Plaintiff Vossen and the Florida State Class)**

106.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

107.    Defendants, operating directly or indirectly in Florida, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of commerce in violation of Florida Statutes § 501.204(1).  These include, but are not limited to, the allegations of misconduct and deceptive acts and practices set forth herein.

108.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and Florida State Class have suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Florida State Class the loss of money paid for Vital eggs and products sold at super-premium prices.

109.    The above unfair and deceptive practices and acts engaged in by Defendants were immoral, unethical, unprecedented, and unscrupulous, because these acts caused substantial injury.

110.    Defendants knew or should have known that their business practices are unlawful, unfair, deceptive, and unconscionable.  Defendants' actions in engaging in the above-named deceptive acts and practices were knowing, willful, wanton, and reckless with respect to the rights of Florida residents.

111.    Plaintiff and members of the Florida State Class seek actual damages under Florida Statutes § 501.211(2) and attorneys' fees under Florida Statutes § 501.2105(1) to be proven at trial.

112.    Plaintiff and the Florida State Subclass also seek an order enjoining Defendants' unfair, unlawful and/or deceptive practices, declaratory relief, and other just and proper relief available under Florida laws.

**COUNT VI:**
**Michigan Consumer Protection Act**
**(On Behalf of Plaintiff Usler and the Michigan State Class)**

113.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

114.    Defendants, operating directly or indirectly in Michigan, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of commerce in violation of the Michigan Consumer Protection Act, Act 331 of 1976 § 445.903, *et seq*. These include, but are not limited to, the allegations of misconduct and deceptive acts and practices set forth herein, including causing a probability of confusion or misunderstanding as to the source, sponsorship, approval or certification of their goods or services, representing that their goods or services have approval, characteristics, uses, or benefits; that they did not and causing a probability of confusion or misunderstanding as to the rights, obligations, or remedies of the parties to the relevant transaction, and failing to reveal material facts the omission of which tended to mislead or deceive Michigan consumers and which facts could not have reasonably been known by such consumers upon them entering in to the consumer transaction at issue.

115.    The Michigan State Class consists of residents in the State of Michigan who are asserting claims as against Defendants in this action.

116.    Defendants failed to reveal facts that are material to the transaction in light of the misrepresentations and facts made in a positive manner by them in violation of Mich. Comp. Laws Ann. § 445.903(1).

117.    As a direct and proximate result of these practices, Plaintiff and the Michigan State Class suffered injuries to legally protected interests as described herein, including, but not limited to, the loss of money paid for Vital eggs sold at super-premium prices.

118.    The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and the Michigan State Class because they could not reasonably avoid them.

119.    Defendants knew or should have known that their practices are unfair and deceptive.  Defendants' actions in engaging in the above-named unfair practices and acts were knowing and willful and/or wanton or reckless.  Plaintiff and the Michigan State Class seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts, monetary relief, actual damages in the amount to be determined at trial, statutory damages in the amount of $250 for each Class member, and other just and proper relief as is available under Mich. Comp. Laws Ann. § 445.911.

**COUNT VII:**
**New York Business Laws Section 349 and Section 350-A**
**(On Behalf of Plaintiff Tanz, Sankowich, Karaca,**
**and Gozde and the New York State Class)**

120.    The Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

121.    Defendants, operating directly or indirectly in New York, engaged in unfair, deceptive, and unlawful acts and practices and false advertising in the conduct of commerce in violation of New York General Business Law §§ 349(a) and 350-a as described herein.

122.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and the New York State Class suffered an ascertainable loss of money or property as described above, including, but not limited to, the monies paid for Vital eggs sold at super-premium prices.

123.    The described unfair and deceptive acts and practices by Defendants are immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and the New York State Class which they could not reasonably avoid.

124.    Defendants knew or should have known that their business practices are unlawful, unfair, and deceptive in that their advertising and marketing was misleading in material respects. Defendants' actions in engaging in the above-named deceptive acts and practices were knowing and willful and/or wanton and reckless with regard to the rights of Plaintiff and the New York State Class.

125.    Plaintiff and the New York State Class seek relief under New York General Business Law §§ 349(h) and 350-e(3), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and attorneys' fees and costs.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of all Classes defined herein, respectfully request that the Court enter judgment in their favor as and against Defendants, jointly and severally, as follows:

A.    That the Court certify this action as a class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declare that Plaintiffs are proper class representatives and appoint Plaintiffs' attorneys as class counsel;

B.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiffs and the Classes compensatory, consequential, and general damages in an amount to be determined at trial;

D.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, misrepresentations, omissions, and practices;

E.      That the Court award statutory damages, treble damages, punitive damages and exemplary damages to the extent permitted under applicable law;

F.      That the unlawful acts in the Complaint be adjudged and decreed to be unlawful, and deceptive business practices in violation of the laws in California, Florida, Michigan, New York, and Texas;

G.      That Plaintiffs be granted the declaratory relief sought herein;

H.      That the Court award to Plaintiffs the costs and disbursement of this action, along with reasonable attorneys' fees, including fees and expenses;

I.      That the Court award pre- and post-judgment interests at the maximum legal rate; and

J.      That the Court award such other relief as it deems just and proper.


Dated:   May 20 _____ ___, 2021          Respectfully submitted,

                                               **EDMUNDSON SHELTON WEISS PLLC**

                                               By: /s/ Jesse Z. Weiss
                                               Jesse Z. Weiss (SBN: 24013728)
                                               Ryan Shelton (SBN: 24037484)
                                               317 Grace Lane, Suite 210
                                               Austin, Texas 78746
                                               Telephone:  (512) 596-3058
                                               Facsimile:  (512) 532-6637
                                               Email:  jesse@eswpllc.com
                                                       ryan@eswpllc.com

**BLACKNER STONE & ASSOCS.**
Richard L. Stone (*pro hac vice pending*)
609 South Beach Road
Jupiter Island, Florida 33469
Telephone: (561) 804-9569
Email:  rstoneesq@rstoneesq.com

**PETA FOUNDATION**
Asher Smith (*pro hac vice pending*)
1536 16th Street, NW
Washington, DC 20036
Telephone: (202) 483-7382
Email: AsherS@petaf.org

*Attorneys for Plaintiffs*